# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued December 11, 2007          Decided March 11, 2008

No. 06-3167

UNITED STATES OF AMERICA,
APPELLEE

v.

ABDUL C. JOHNSON,
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 03cr00211-01)

---

*Jenifer Wicks* argued the cause and filed the briefs for appellant.

*John P. Mannarino*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Jeffrey A. Taylor*, U.S. Attorney, and *Roy W. McLeese, III*, Assistant U.S. Attorney.

Before: SENTELLE, *Chief Judge*, GARLAND, *Circuit Judge*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*:   Defendant Abdul Johnson appeals from his conviction on firearms and narcotics charges. He contends that the gun and drug evidence that the government used against him was the fruit of an unlawful detention, that the improper admission of a previous firearms conviction prejudiced the outcome of his trial, that the government did not introduce sufficient evidence to prove that the cocaine base the police seized from him was crack cocaine, and that the district court erred in not granting a new trial on the grounds of newly discovered evidence and nondisclosure of *Brady* material.   We reject Johnson's challenges and affirm the judgment of the district court.

I

On May 20, 2003, a grand jury charged Johnson with four illegal acts:  (1) possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1); (2) possession with intent to distribute five grams or more of cocaine base, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(B)(iii); (3) using, carrying, and possessing a firearm in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1); and (4) simple possession of marijuana, in violation of 21 U.S.C. § 844(a).   In the fall of 2003, the district court held a hearing on Johnson's motion to suppress evidence arising out of the stop that led to his arrest. At the hearing, the government introduced the testimony of Metropolitan Police Department (MPD) Officer Jason Pearce, who stated as follows.

On April 9, 2003, Pearce and Officer Steven Franchak, Investigator Steven Manley, and Detective David Dessin were patrolling a high-crime area in Northeast Washington, D.C., in an unmarked Jeep.  An undercover officer patrolling in the same area radioed to inform them that a blue Buick was "driving crazy" and was heading toward 2nd and Bryant streets.  Shortly

thereafter, the officers saw defendant Johnson pull up in the Buick, double-park, get out of the car while leaving it idling, and approach an unoccupied green Chrysler that was parked on the other side of the street.

As the officers pulled up in their Jeep, they saw Johnson get into the Chrysler's driver's seat, lean over, and begin examining something in the vicinity of the passenger's seat, with six inches of his arm extended underneath the dashboard. When the officers got out of their car, Johnson looked up and noticed them. His eyes then "widen[ed] and his mouth kind of f[ell] half open and he start[ed] fumbling with the driver's side door." Mot. Hr'g Tr. 15 (Oct. 16, 2003). He "looked very shocked and . . . it took him several spastic actions to get the door open and he darted up out of the car." *Id.* at 55. Pearce then directed Johnson to sit back down in the car. As he did so, Johnson began reaching quickly around his waist area. Concerned, Pearce asked him to step out of the car, and when he did, Pearce smelled alcohol on his breath. Johnson then reached toward his waistband again, and Pearce directed him to put his hands on top of the car. Johnson, who seemed unsteady on his feet, complied. Pearce then saw a plastic cup of reddish amber liquid on the passenger side of the Chrysler. At almost the same time, Pearce heard Investigator Manley say that he could see an open container of alcohol inside the blue Buick.

Pearce handcuffed Johnson and informed him that he was being arrested for "POCA" (possession of an open container of alcohol in an automobile). When Pearce asked Johnson to turn around, Johnson pressed his right side against the car. Manley then approached to assist Pearce; after a short struggle, Manley lifted Johnson's shirt, revealing a semiautomatic handgun in his waistband. Franchak ran over to grab the gun, and Johnson exclaimed: "Yeah, I carry a gun. I got shot in my neck. They

killed my man. You guys never found who did that. I'll carry a gun for the rest of my life." *Id.* at 21.

Officer Pearce searched Johnson and found two ziplocks of a "green plantlike substance" in his breast pocket. Pearce also recovered $1883 in cash from Johnson's pockets and several ziplocks containing "white chunks of rocklike substance" from the Chrysler's glove compartment. When Pearce called to another officer that he had found some "crazy candy" in the car, Johnson immediately yelled out: "Crack, I know we didn't find any crack in my car. I know we didn't find any crack in my car. I bought that car from my dad three years ago. There's no crack in that car." *Id.* at 22-24.

Because a crowd had started to gather, the officers decided to remove Johnson from the scene in their Jeep. At one point, Johnson complained that the handcuffs were too tight, and Manley, who was sitting next to him, shifted their position. During the ride to MPD's major narcotics branch, Johnson "start[ed] moving and talking and [was] animated." *Id.* at 26. When they arrived at the branch, the officers removed Johnson from the Jeep and discovered four ziplocks containing a white, rock-like substance and one ziplock containing a green, plant-like substance in the seatbelt reservoir where he had been sitting. Franchak then searched the area behind Johnson's seat and recovered 15 more bags filled with a white, rock-like substance and one more bag filled with a green, plant-like substance. The ziplock bags containing the white substance later field-tested positive for cocaine, and those containing the green substance tested positive for THC, the active ingredient in marijuana.

On the second day of the suppression hearing, the defense introduced the testimony of Nancy Jones, a resident of the area where Johnson was arrested. Jones stated that Johnson was a friend of her niece and that she had known him for seven or

eight years. She testified that, on April 9, 2003, she saw him driving his blue Buick. The police then "came up with their guns drawn on both sides and made him get out of his car." Mot. Hr'g Tr. 82 (Nov. 10, 2003). "They took him over directly across the street on another car and . . . his pants had fell down and they were searching him." *Id.* Jones told one of the officers, "you all don't have to do him that rough." *Id.*

After listening to the testimony of both Pearce and Jones, the district court credited Pearce. The court concluded that neither the stop nor the search violated the Fourth Amendment, and it denied Johnson's motion to suppress evidence. *Id.* at 107.

At Johnson's trial, which began on April 23, 2004, the government offered testimony from Pearce, Manley, Franchak, and Dessin that was in accord with Pearce's testimony at the suppression hearing. Pearce also testified that the substance he found in the glove compartment was "crack cocaine." Trial Tr. 75 (Apr. 26, 2004). Pearce, Manley, and Franchak testified that they saw a total of 19 ziplocks of a rock-like substance and two ziplocks of a weed-like substance in the Jeep after Johnson had been removed. The jury also heard from a narcotics expert, Detective Tyrone Thomas, who stated that the white, rock-like substance recovered in this case was street-level crack cocaine and that it had a total street value of $6660.

In addition to this testimony, the parties stipulated that a DEA chemist had determined that the controlled substances seized on April 9, 2003 were cocaine base and marijuana. The chemist analyzed 5.8 grams of cocaine base (from the three ziplocks seized from the Chrysler's glove compartment), 7.9 grams of cocaine base (from the four ziplocks seized from the Jeep's seatbelt reservoir), 34.1 grams of cocaine base (from the 15 ziplocks seized from the area of the Jeep behind Johnson's seat), and 5.73 grams of marijuana. The parties further

stipulated that Johnson had previously been convicted of a crime punishable by more than one year's imprisonment and that the seized handgun was operable and had an interstate nexus.

The government also introduced testimony, from MPD fingerprint examiner Diane Downing, that Johnson's fingerprint was on the magazine of the gun taken from his waistband. Finally, pursuant to a pretrial ruling by the court, the parties stipulated that "on August 25, 1997, the defendant Abdul Johnson was convicted of carrying a pistol without a license and possession of cocaine in the Superior Court of the District of Columbia," and that Johnson had also been convicted of possession with intent to distribute cocaine in 1992. Trial Tr. 4-5 (Apr. 27, 2004).

Johnson did not testify or call any witnesses. On April 28, 2004, the jury convicted him on all counts. Thereafter, the district court denied his motion for a new trial and sentenced him to 136 months' imprisonment. Johnson timely appealed and now raises four challenges to his conviction.

II

Johnson's first contention is that the district court erred in denying his motion to suppress the gun and drug evidence because the stop that led to his arrest violated the Fourth Amendment. The stop in question began with Officer Pearce's direction to Johnson to "sit back down" as he tried to dart out of the Chrysler. Mot. Hr'g Tr. 16 (Oct. 16, 2003). Johnson does not separately challenge the searches that yielded the gun and drugs; he contends only that these items were the unlawful fruits of a stop that was unreasonable under *Terry v. Ohio*, 392 U.S. 1 (1968). *See* Appellant's Br. 12, 23-24.

In *Terry*, the Supreme Court held that "the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 30). We decide de novo whether the police had reasonable suspicion for a stop, but we review the district court's "findings of historical fact only for clear error" and give "due weight to inferences drawn from those facts." *Ornelas v. United States*, 517 U.S. 690, 699 (1996). We also review the district court's credibility determinations only for clear error, *see United States v. Broadie*, 452 F.3d 875, 880 (D.C. Cir. 2006), and may not overturn them unless the court has credited "exceedingly improbable testimony," *United States v. Mapp*, 476 F.3d 1012, 1017 (D.C. Cir. 2007) (quoting *United States v. Adamson*, 441 F.3d 513, 519 (7th Cir. 2006)).

Johnson first asks us to reverse the district court because it credited Officer Pearce's testimony (that the police did not approach Johnson until he was inside the green Chrysler) over Nancy Jones' testimony (that she saw the police force Johnson out of the blue Buick and take him across the street to another car). Because there was nothing improbable about Pearce's testimony, we find no clear error in the court's decision to credit it.

Johnson next argues that, even accepting the officer's version of the events, the stop nonetheless transgressed *Terry*. In response, the government urges us to hold that the stop was lawful on the ground that Johnson was committing a parking violation -- double-parking -- at the time of the stop. Because the police may stop an automobile when they have probable cause to believe that a traffic violation has occurred, *see Whren v. United States*, 517 U.S. 806, 810 (1996), the government argues that the same should be true when the police witness a

parking violation, Gov't Br. 34.  Although other circuits have so held, *see United States v. Choudhry*, 461 F.3d 1097, 1103-04 (9th Cir. 2006); *Flores v. City of Palacios*, 381 F.3d 391, 402-03 (5th Cir. 2004); *United States v. Copeland*, 321 F.3d 582, 594 (6th Cir. 2003), this circuit has not yet decided the question, *see United States v. Spinner*, 475 F.3d 356, 358 (D.C. Cir. 2007) (assuming without deciding that the defendant's parking violation justified his initial detention).

Nor need we decide that question in order to resolve this case, as the officers' decision to stop Johnson was reasonable under the "totality of the circumstances test" normally employed in a *Terry* analysis.  *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *see Sokolow*, 490 U.S. at 9-10; *United States v. Edmonds*, 240 F.3d 55, 59-60 (D.C. Cir. 2001).  The police received a report about a blue Buick "driving crazy" in "a high violence and high drug transaction area."  Mot. Hr'g Tr. 12-13 (Oct. 16, 2003).  They then observed Johnson quickly drive by, double-park, leave the car idling, cross the street, and get into an unoccupied green Chrysler.  After the officers pulled up, they watched Johnson reach under the Chrysler's dashboard; when he noticed their presence, he looked shocked, fumbled with the door, and attempted to dart out of the car.  Together, these articulable facts supported the officers' "reasonable suspicion that [Johnson] was engaged in wrongdoing when they encountered him" in the Chrysler.  *Sokolow*, 490 U.S. at 7; *see Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *Terry*, 392 U.S. at 30; *United States v. Dykes*, 406 F.3d 717, 720 (D.C. Cir. 2005); *Edmonds*, 240 F.3d at 57, 60.

III

Johnson's second challenge concerns the district court's decision to admit evidence of his 1997 Superior Court conviction for carrying a pistol without a license.

9

A

At the pre-trial motions hearing, the government argued that the 1997 conviction was relevant to prove Johnson's knowledge, intent, and absence of mistake as to his possession of the gun in the present case. The defense responded that the court should bar evidence of the conviction under Federal Rule of Evidence 404(b), as improper character evidence, or under Rule 403, as unduly prejudicial. Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith," but that it may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." FED. R. EVID. 404(b). Evidence that is admissible under Rule 404 may nonetheless be excluded by the trial court under Rule 403 "if its probative value is substantially outweighed by the danger of unfair prejudice." FED. R. EVID. 403; *see Old Chief v. United States*, 519 U.S. 172, 182 (1997); *United States v. Douglas*, 482 F.3d 591, 600 (D.C. Cir. 2007).

Because the police witnesses testified that they recovered the gun in this case from Johnson's waistband, the defense maintained that further evidence that Johnson knowingly and intentionally possessed the weapon was inappropriate. The district court rejected this argument, holding that the government could introduce the prior conviction to prove Johnson's intent, knowledge, and absence of mistake. The court ruled, however, that the prosecution could not put on evidence regarding the facts underlying the conviction. It recommended that the parties instead adopt a stipulation regarding the conviction, and the parties did so. The stipulation was the only

evidence of the 1997 conviction that was entered at trial.[1]  On appeal, Johnson contends -- as he did in the district court -- that the court erred under Rules 404(b) and 403 in admitting any evidence regarding the prior conviction.

"We review a claim that a district court improperly admitted evidence under Rule 404(b) solely to determine whether the court abused its discretion." *United States v. Pindell*, 336 F.3d 1049, 1056-57 (D.C. Cir. 2003).  Because the "trial court is in the best position to perform [the] subjective balancing" required under Rule 403, its decision not to exclude evidence under that rule "should be reviewed only for grave abuse." *United States v. Cassell*, 292 F.3d 788, 795-96 (D.C Cir. 2002) (internal quotation marks omitted).  If we conclude that the district court erred in admitting evidence under either rule, our review -- when, as here, the defendant objected to admission at trial -- is limited by the harmless error standard of Federal Rule of Criminal Procedure 52(a).  *See United States v. Coumaris*, 399 F.3d 343, 347 (D.C. Cir. 2005).  Under that standard, we may not correct the district court's error unless it affected the defendant's "substantial rights."  FED. R. CRIM. P. 52(a).  "[I]n most cases [this] means that the error must have been prejudicial:  It must have affected the outcome of the district court proceedings." *United States v. Olano*, 507 U.S. 725, 734 (1993).  When the error did not involve a constitutional right, it is not prejudicial "unless it had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *United States v. Linares*, 367 F.3d 941, 952 (D.C. Cir. 2004) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  The government bears the burden of proving the absence of such prejudice.  *Id.*; *see Coumaris*, 399 F.3d at 347 n.1.

---

[1]The same stipulation included an acknowledgment that Johnson had previously been convicted of cocaine offenses in 1997 and 1992. Johnson does not challenge that part of the stipulation on appeal.

B

On appeal, the government concedes that the district court erred in admitting proof of Johnson's 1997 conviction. It does so on the basis of this circuit's decision in *United States v. Linares*, which was issued a few weeks after the conclusion of Johnson's trial. In *Linares*, the defendant was likewise charged with being a felon in unlawful possession of a firearm, and this court held that the trial judge erroneously permitted the government to present evidence that Linares had previously possessed a handgun. At Linares' trial, eyewitnesses testified, as they did here, that they saw the gun on the defendant's person -- indeed, that he had held the gun in his hand and fired it. "Given the evidence in this case," the court said, "we do not understand how Linares's previous possession of a pistol makes it any more likely that he knowingly possessed a gun this time." *Linares*, 367 F.3d at 946. "If the jury believed these eyewitnesses, then Linares possessed the gun knowingly; if it did not, then it should have acquitted based on the government's failure to prove possession rather than its failure to prove knowledge." *Id*.

Although the government concedes that the district court wrongly admitted Johnson's 1997 conviction under *Linares*, it argues that this error was harmless. On this point, too, *Linares* governs. Although the *Linares* court held that the admission of the prior gun possession in that case was error, it nonetheless found the error harmless. In light of "multiple and consistent eyewitness accounts" placing the gun in the defendant's hand, the court concluded that the government had carried its burden of proving that the error did not have a substantial and injurious effect on the jury's verdict. *Id.* at 952-53.

The evidence in this case commands the same conclusion. At trial, multiple arresting officers testified, without

inconsistency or contradiction, that they discovered the gun in Johnson's waistband. That discovery was preceded by several attempts by Johnson to reach for his waistband, as well as an effort to keep his waist away from the officers by pressing it against the car. The officers further testified, again without contradiction, that as soon as Officer Franchak grabbed the gun, Johnson exclaimed: "[O]f course I carry a gun. . . . I've been shot seven times, I got shot in my neck. They killed my man. You all never found who did that. I will carry a gun for the rest of my life." Trial Tr. 32 (Apr. 26, 2004). Finally, the fingerprint examiner testified that she found Johnson's fingerprint on the magazine of the gun that the officers took from his waistband. On this record, we conclude that the admission of Johnson's 1997 conviction did not have a "substantial and injurious effect" on the jury's verdict and hence was harmless. *Kotteakos*, 328 U.S. at 776.[2]

IV

Johnson next contends that the district court erred in denying his motion for judgment of acquittal on the charge of possession with intent to distribute cocaine base. The court should have granted the motion, he maintains, because the government failed to introduce sufficient evidence that the cocaine base at issue was either smokable cocaine base or crack cocaine, as required by *United States v. Brisbane*, 367 F.3d 901 (D.C. Cir. 2004).

Count Two of the indictment charged Johnson with violating 21 U.S.C. § 841(a) and (b)(1)(B)(iii), by possessing with intent to distribute five grams or more of "cocaine base."

---

[2]We also note that the government did not mention the 1997 conviction in its closing or rebuttal arguments. The jury learned of it only through a bare-bones stipulation.

As we have explained in previous cases, a "certain quantity of 'cocaine base' will trigger much stiffer penalties than an equivalent quantity of powdered cocaine -- that is, 'cocaine, its salts, optical and geometric isomers, and salts of isomers.'" *United States v. Powell*, 503 F.3d 147, 148 n.1 (D.C. Cir. 2007) (comparing 21 U.S.C. § 841(b)(1)(A)(ii)(II) & (B)(ii)(II) with 21 U.S.C. § 841(b)(1)(A)(iii) & (B)(iii)); *see United States v. Johnson*, 437 F.3d 69, 74 (D.C. Cir. 2006). In *Brisbane*, we held that, to "uphold the higher penalties that § 841 prescribes for crimes involving 'cocaine base,'" the government must prove that the kind of cocaine base seized was either "smokable cocaine base or crack cocaine." *Johnson*, 437 F.3d at 71 (citing *Brisbane*); *see United States v. Baugham*, 449 F.3d 167, 171 (D.C. Cir. 2006).[3] Our review of a challenge to the sufficiency of the evidence to establish a statutory element is limited: we must accept the jury's guilty verdict if we conclude that "*any* rational trier of fact could have found the essential element[] of the crime beyond a reasonable doubt." *United States v. Arrington*, 309 F.3d 40, 48 (D.C. Cir. 2002) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

In light of the parties' stipulation to the chemist's report, there is no doubt that the white, rock-like substance seized in this case was cocaine base. There is also no doubt that the government did not attempt to prove that the substance was smokable cocaine base, as no evidence of smokability was introduced. Thus, as in many of our previous cases, the only

---

[3]Johnson argues that, because the government failed to prove that the substance seized from him was smokable or crack, his conviction for possession with intent to distribute cocaine base must be vacated, and a conviction for the lesser-included offense of possession with intent to distribute cocaine -- with a correspondingly reduced sentence -- must be entered. Appellant's Br. 16-17 (citing *Brisbane*, 367 F.3d at 915).

question is whether the evidence was sufficient to prove that the cocaine base the officers found was crack cocaine.

At trial, the arresting officers testified that the drugs they seized from Johnson were "white" and "rock-like" and that, during their many years working for the major narcotics branch, they had often seen crack packaged as it was in this case. *E.g.*, Trial Tr. 35, 45, 123, 149, 172, 190 (Apr. 26, 2004). Officer Pearce specifically testified that the substance he found in the Chrysler's glove compartment was "crack cocaine." *Id.* at 75. The government's narcotics expert testified that the drugs appeared to be "street-level crack cocaine," that "[c]rack cocaine is sold in these small Ziploc bags," and that the amount in question would generate about 666 bags of crack that would sell for ten dollars each. Trial Tr. 13-15 (Apr. 27, 2004). Finally, several officers testified that, upon hearing Officer Pearce announce that he had found some "crazy candy" in the glove compartment of the Chrysler, Johnson spontaneously yelled out: "Crack, I know you didn't find any crack in that car, ain't never been any crack in that car." *E.g.*, Trial Tr. 37, 190 (Apr. 26, 2004).

The evidence introduced in this case is indistinguishable from evidence we have previously held sufficient to establish that cocaine base is crack.[4] Johnson objects that the evidence

_____

[4]*See United States v. Pettiford*, No. 07-3027, slip op. at 17 (D.C. Cir. Feb. 26, 2008) (the arresting officer, based on his experience in "prior arrests dealing with crack cocaine," testified that the "white, rock-like substance" he seized was "crack cocaine"; a narcotics expert opined that the "cluster of white . . . rock-like substance . . . was cocaine base which is also known as crack cocaine" in Washington, D.C.; and the expert further testified that the substance was packaged in amounts that were consistent with the wholesale distribution of crack and was found with paraphernalia typical of equipment used in

was insufficient because there was no testimony that the substance was smokable. Our cases make clear, however, that "evidence about the substance's smokability" is not required to sustain a finding that it is crack. *Johnson*, 437 F.3d at 75; *see Pettiford*, slip op. at 18; *Powell*, 503 F.3d at 148.[5] The district

---

wholesale crack transactions); *United States v. Lloyd*, No. 05-3007, slip op. at 16-17 (D.C. Cir. Feb. 22, 2008) (the seizing officer identified the substance as "white" and "rock-like"; a narcotics expert identified the white, rock-like substance found in eleven ziplock bags as "crack cocaine"; and the expert further testified that the crack was packaged for wholesale street distribution and that the kind of paraphernalia found with the drugs was used to measure amounts when packaging crack for wholesale distribution); *Powell*, 503 F.3d at 148 (the seizing officer, experienced in crack cases, testified that the "'rock-like' and 'off-white' or 'yellowish'" substance was crack; and a narcotics expert testified that the material was crack and not powder cocaine); *United States v. Lawrence*, 471 F.3d 135, 139 (D.C. Cir. 2006) (police witnesses testified that the substance was a "large white rock substance" and that the sale "followed conventional practices for the sale of crack cocaine"; and undercover officers testified that the defendant gave them the substance in response to their requests to buy crack); *Baugham*, 449 F.3d at 183 (a police witness testified that the substance was a "white rock substance," distinguished the substance from powder cocaine, and agreed that crack was "vernacular slang for cocaine base"); *Johnson*, 437 F.3d at 75 (the seizing officers "testified that the recovered drugs were 'rock' or 'white rock,' a physical description that suggests crack cocaine"; a narcotics expert testified that paraphernalia found in the defendant's apartment was associated with crack cocaine; and the expert further testified that the quantity and packaging of the drugs were consistent with the street sale of crack cocaine).

[5]Johnson also objects that the narcotics expert "used interchangeably the terms 'cocaine base' and 'crack cocaine,'" and he therefore maintains that the expert's testimony cannot be used to support the distinction required by *Brisbane*. Appellant's Reply Br.

court did not err in denying Johnson's motion for judgment of acquittal.

Before concluding this Part, we note that, at oral argument, Johnson's counsel challenged the adequacy of the description of the charged offense contained in the jury verdict form. Oral Arg. Recording at 3:00. Employing the statutory language, the verdict form asked the jury whether it found the defendant guilty of possession with intent to distribute five grams or more of "cocaine base"; it did not mention "crack cocaine." Counsel contends that this means that the jury did not find Johnson guilty of possession with intent to distribute crack, but only of possession with intent to distribute generic cocaine base. This objection was not asserted in the district court and was not made on appeal until the reply brief. Even then, it was only mentioned in passing. It is therefore waived. *See, e.g.*, *United States v. Johnson*, 216 F.3d 1162, 1168 (D.C. Cir. 2000).

Even if the point were not waived, it would not prevail. Count Two of the indictment charged Johnson with "possession with intent to distribute cocaine base, also known as crack." Indictment, Gov't App. 31. The district court's jury instructions repeatedly stated that, to convict Johnson on that count, the jury would have to find him guilty of possession with intent to distribute "crack cocaine." *E.g.*, Trial Tr. 96 (Apr. 27, 2004) ("[T]he government must prove . . . that Mr. Johnson possessed a controlled substance, specifically crack cocaine[,] . . . that Mr. Johnson possessed the crack cocaine knowingly and

---

3. We rejected a similar objection in *Lloyd*, where the expert testified that the seized substance was crack but also said that "crack is a 'street name' for the same drug that chemists identify as 'cocaine base.'" *Lloyd*, slip op. at 17; *see also Baugham*, 449 F.3d at 183 (citing an officer's testimony that "'cocaine base' was 'another name' for '[c]rack' and that crack was the 'vernacular slang for cocaine base'").

intentionally[,] . . . [and] that when Mr. Johnson possessed this crack cocaine, he had the specific intent to distribute it."). We therefore reject the argument that, in marking the "guilty" line of the verdict form, the jury did not find Johnson guilty of a crime involving crack cocaine.

V

Finally, Johnson argues that the district court erred in denying his motion for a new trial. That motion was based on two grounds: a witness affidavit that he obtained only after the trial ended, and an alleged *Brady* violation. We review both grounds below.

A

Following his conviction, Johnson filed a motion for a new trial, contending that he had recently obtained eyewitness evidence that refuted the government's case. The new evidence, which he maintained contradicted the police officers' testimony that they approached him when he was inside the green Chrysler, consisted of an affidavit from a woman named Sharon Jones. The relevant portion of the affidavit recited Jones' observations as follows:

> The police hopped out of the truck with guns and pulled Abdul [Johnson] out of the car. The police officers started searching him. . . . [T]hey pulled Abdul across the street and put him against the green car on the other side of the street. Some of the police were searching the green car and one of the white officers searching in the green car said that he found a gun and some candy. The police were talking to each other about how they were going to lock him up for what was found in the green car.

Jones Statement, Appellant's App. 375. The district court denied Johnson's motion, concluding that "the defendant has not argued diligence in the attempt to procure the newly discovered evidence" and that the affidavit "would not likely produce an acquittal." *United States v. Johnson*, Mem. Order at 2-3 & n.1 (Oct. 27, 2005).

We review a district court's ruling on a motion for a new trial for abuse of discretion. *See, e.g.*, *United States v. Gloster*, 185 F.3d 910, 914 (D.C. Cir. 1999). For a defendant to obtain a new trial because of newly discovered evidence, he must satisfy each of five requirements:

> (1) the evidence must have been discovered since the trial; (2) the party seeking the new trial must show diligence in the attempt to procure the newly discovered evidence; (3) the evidence relied on must not be merely cumulative or impeaching; (4) it must be material to the issues involved; and (5) [it must be] of such nature that in a new trial it would probably produce an acquittal.

*United States v. Lafayette*, 983 F.2d 1102, 1105 (D.C. Cir. 1993) (quoting *Thompson v. United States*, 188 F.2d 652 (D.C. Cir. 1951)).

We agree with the district court that Johnson did not show -- indeed, did not even argue -- that he had diligently attempted to procure Sharon Jones' affidavit. Nor does he argue diligence on appeal. And it is not likely that he could. Sharon Jones is Nancy Jones' daughter, *see* Oral Arg. Recording at 14:34, and at the time of Johnson's arrest, the two women lived together. Given that the defendant was able to obtain Nancy's testimony in time for the pretrial suppression hearing, his failure to pursue

the testimony of her daughter prior to trial manifests a lack of diligence.

Although it is not necessary to our decision, we also agree with the district court's determination that Sharon's affidavit was not likely to have produced an acquittal. Sharon's proffered testimony would have added little to that already available from Nancy. Accordingly, we find no abuse of discretion in the district court's denial of a new trial on the basis of the Sharon Jones affidavit.

B

Johnson's second argument for a new trial was that the government had failed to disclose *Brady* material that could have been used to impeach Officer Franchak's testimony. The alleged *Brady* material was an official MPD reprimand of Franchak, based on the results of an Office of Citizen Complaint Review investigation, for conducting an unexplained traffic stop and harassing the driver in 2001. *See* Appellant's App. 377-93.[6] The district court rejected Johnson's argument on the ground that the reprimand would not have been admissible at trial, and hence was not favorable to Johnson, because it would have been barred by Federal Rule of Evidence 608(b). Under that rule, "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness, . . . may not be proved by extrinsic evidence." FED R. EVID. 608(b).

---

[6]Johnson's counsel did not receive the material until after Johnson's trial, and only then by happenstance: she received the material in connection with a discovery request she made in a different case that involved the same officer. *See* Oral Arg. Recording at 16:47.

In *Brady v. Maryland*, the Supreme Court held that the Due Process Clause imposes upon the prosecution an obligation to disclose "evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). In *Giglio v. United States* and *United States v. Bagley*, the Court held that "[i]mpeachment evidence, . . . as well as exculpatory evidence, falls within the *Brady* rule." *Bagley*, 473 U.S. 667, 676 (1985) (citing *Giglio*, 405 U.S. 150, 154 (1972)). As the Court subsequently explained, a "true *Brady* violation" has three components: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). To satisfy the prejudice component, the withheld evidence must be "material"; that is, there must be "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 280 (quoting *Bagley*, 473 U.S. at 676); *see also Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995). The defendant bears the burden of showing a reasonable probability of a different outcome. *Strickler*, 527 U.S. at 291; *United States v. Gale*, 314 F.3d 1, 4 (D.C. Cir. 2003).

Whether the government has breached its obligations under *Brady* is a question of law, which we review de novo. *In re Sealed Case*, 185 F.3d 887, 892 (D.C. Cir. 1999); *see United States v. Cuffie*, 80 F.3d 514, 517 (D.C. Cir. 1996); *United States v. Lloyd*, 71 F.3d 408, 411 (D.C. Cir. 1995). To decide this question, we need not address the district court's holding that the reprimand would have been inadmissible at trial, or the government's contention that cross-examination using the reprimand would not have materially discredited Franchak's

testimony.[7]  In this case, the government's nondisclosure was nonmaterial regardless of whether the reprimand would have been admissible and regardless of whether it would have undermined Franchak's testimony.

In determining whether there is a reasonable probability that disclosure would have yielded a different outcome, *see Strickler*, 527 U.S. at 280, "the court must consider the non-disclosure dynamically, taking into account the range of predictable impacts on trial strategy." *Gale*, 314 F.3d at 4.  This means that the court must consider whether, if use of the material would have substantially discredited a witness, the government would have proceeded to trial without that witness' testimony. *Id.* at 4-5.  When the government has other qualified witnesses to prove its case, we cannot assume that it "would have foolishly charged ahead, blindly offering [the compromised witness] and exposing itself to his inevitable demolition on cross." *Id.* at 4.  In such cases, nondisclosure would not be material in *Brady* terms.  *See id.* at 4-5 (holding that, where the government could have replaced its impeachable expert with another, the defendant could not show that disclosure of the potential impeachment material would have been reasonably likely to yield a different result); *see also United States v. Matthews*, 168 F.3d 1234, 1243 (11th Cir. 1999) (rejecting a

---

[7]Even if extrinsic evidence of the reprimand would have been inadmissible, Rule 608(b) would not necessarily have barred "inquir[y] into" the reprimand "on cross-examination of the witness . . . concerning the witness' character for truthfulness or untruthfulness." FED. R. EVID. 608(b).  Our cases make clear that the government's effective foreclosure of such cross-examination, by its failure to disclose the underlying extrinsic evidence to the defense, can (where material) constitute a *Brady* violation. *See United States v. Whitmore*, 359 F.3d 609, 620 (D.C. Cir. 2004); *United States v. Bowie*, 198 F.3d 905, 909 (D.C. Cir. 1999).

*Brady* claim because, if the internal investigation of a testifying detective "had been disclosed, it is unlikely that the government would have used" the detective's testimony, and because there was overwhelming evidence implicating the defendants in the charged conspiracy without that testimony).

In this case, Officer Franchak did not testify at the suppression hearing. The government's only witness at that hearing was Officer Pearce. Hence, the government's failure to disclose impeachment evidence regarding Franchak was clearly not material to the outcome of Johnson's Fourth Amendment challenge.

Franchak did testify at Johnson's trial. But at trial, he was only one of several arresting officers who testified about the circumstances of Johnson's arrest, including the discovery of the handgun in his waistband, the marijuana in his pocket, and the 5.8 grams of crack cocaine in the Chrysler's glove compartment. Other officers also testified to Johnson's inculpatory exclamation when the police found the gun and to his statement when they found the "crazy candy." Had the reprimand been disclosed and had the government regarded it as damaging, the prosecution's case regarding the gun and these drugs would have proceeded in virtually identical fashion without Franchak's testimony.

We are not certain that the same can be said for the government's case regarding the crack cocaine and marijuana subsequently recovered from the Jeep in which Johnson was transported after his arrest. The record is unclear as to whether Franchak was the only officer who could have testified to the discovery of that evidence.[8] By failing to raise this point in his

---

[8]Some of the other officers' trial testimony suggests that they witnessed Franchak's discovery of at least one portion of the drugs in

briefs, however, the defendant has waived it. *See, e.g.*, *Johnson*, 216 F.3d at 1168.[9] In any event, we do not believe that Johnson could satisfy his burden of showing that the absence of testimony regarding the drugs found in the Jeep would have materially affected the verdict. Johnson was indicted for -- and convicted of -- possession with intent to distribute five grams or more of cocaine base and possession of a detectable amount of marijuana. Three officers other than Franchak testified to discovering 5.8 grams of crack cocaine in the Chrysler's glove compartment and .69 grams of marijuana in Johnson's pocket. Given that evidence, Johnson cannot show "a reasonable probability that . . . the result of the proceeding would have been different" if the reprimand had been disclosed and Franchak removed from the witness list. *Bagley*, 473 U.S. at 682 (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).[10]

---

the Jeep, while different testimony suggests that the other officers had walked away from the vehicle and did not return until Franchak alerted them that he had discovered additional drugs.

[9]The only basis upon which Johnson's briefs contend Franchak was a critical witness is that he "was the officer who made the decision [to] investigate the alleged double parked vehicle and brought his vehicle in a position to stop Mr. Johnson." Appellant's Br. 29; Appellant's Reply Br. 4.

[10]The additional quantities of cocaine base and marijuana that Franchak found in the Jeep could, of course, have affected Johnson's sentence. But Johnson does not raise any sentencing claim on appeal, and again, it is doubtful that he could. Although Johnson obtained the material regarding Franchak's reprimand before the sentencing hearing commenced, *see* Oral Arg. Recording at 17:41, he did not attempt to introduce it at that hearing to impeach Franchak's trial testimony. The Federal Rules of Evidence would not have barred such use. U.S. Sentencing Guidelines § 6A1.3 cmt. ("In determining the relevant facts, sentencing judges are not restricted to information that

24

Accordingly, there is no basis for reversing the district court's denial of Johnson's motion for a new trial.

## VI

For the foregoing reasons, the judgment of the district court is

*Affirmed.*

---

would be admissible at trial."); *see United States v. Bras*, 483 F.3d 103, 108-09 (D.C. Cir. 2007).